576 So.2d 825 (1991)
Wayne BARBER, Appellant,
v.
STATE of Florida, Appellee.
No. 89-2348.
District Court of Appeal of Florida, First District.
March 13, 1991.
Barbara M. Linthicum, Public Defender, Carl S. McGinnes, Asst. Public Defender, Tallahassee, for appellant.
Robert A. Butterworth, Atty. Gen., Gypsy Bailey, Asst. Atty. Gen., Tallahassee, for appellee.
SMITH, Judge.
Appellant appeals his first degree murder conviction for the death of his wife, raising several errors. We agree with appellant that the trial court reversibly erred in refusing to allow the defense to introduce into evidence a taped recording of appellant's custodial interrogation. Appellant sought to introduce the tape and have it played to the jury for the purpose of demonstrating to the jury the incoherent nature of his speech, which was relevant to his defense of voluntary intoxication.
On the evening of June 23, 1988, appellant and his wife went to several bars, partying with friends. They had several drinks and champagne, and appellant also had some beer. They went to one bar where their son, Randy, worked. At one *826 point, appellant complained of a headache, and Randy gave him some Xanax. The Barbers went home in the early morning hours of June 24.
At approximately 3:30 A.M. on the morning of June 24, appellant shot and killed his wife. She was shot in the chest, under the chin, and once in the forehead. Shortly thereafter, appellant made several long distance telephone calls to his wife's relatives in New York, explaining to them what he had done. He intimated that he intended to kill himself as well, after he talked to their son, Randy. One of the relatives called the police.
The police went to the Barbers' home and were joined by appellant's son, Randy. Randy entered the home and obtained the gun from appellant. The body of appellant's wife was discovered in the bedroom. When appellant was placed in the police car to be taken to the police station, Officer Arrowood testified that he was talking fast, looking around, and acting incoherent. Appellant asked why he had to be locked up, and said he didn't do anything.
At the police station, at approximately 6:30 A.M., appellant gave a taped statement to Chief Investigator Don Vinson and Deputy Albert Ridge. The booking officer testified that when he booked appellant, appellant smelled strongly of alcohol, and that he vomited and appeared to be drunk. About 11:00 A.M. on June 24, appellant was given an intoxilizer test. The test showed a blood alcohol level of .04.
At the trial, the state presented the testimony of Joanne Barber's family members who had spoken to appellant on the telephone immediately after she was shot. The following colloquy occurred between the prosecutor and Linda Walters, Joanne Barber's sister:
Q. Did you ask him if he had been drinking?
A. Yes, I did.
Q. Okay. And what did he reply? How did he reply?
A. He got mad and said, no, I haven't. And then in a few seconds he said, yes, I only had a couple beers.
Q. Okay. Have you previously seen him under the influence of alcoholic beverages?
A. Yes, I have.
Q. Okay. And does he have a distinctive characteristic to his voice when he's been drinking some beer?
A. Yes, he does. When he's had a few too many to drink, he has a tendency to stutter.
Q. Okay. And during this phone conversation, did he stutter at all?
A. No, he did not.
Q. Okay. Was he coherent? Were you able to understand everything that he was saying?
A. Yes, I did.
Q. Did he appear to know what he was saying to you?
A. Yes, definitely. He didn't hesitate with one word he told me.
Similarly, Linda Walters' husband, Robert Walters, was asked:
Q. Does he have  Does he tend to stutter after he's been drinking?
A. Yes, he does.
Q. Okay. During this conversation, did he stutter?
A. No, he didn't. Very clear, very coherent.
Q. Did you have any trouble understanding him or anything like that?
A. No, not at all.
Q. Do you have an opinion as to whether he was intoxicated to the point where he didn't know what he was doing or something to that effect?
A. I would say he wasn't.
Q. Okay. Did you even think he had been drinking at all?
A. I  You know, if I thought he had and he sounded like that, I probably would have asked him. But I have no doubt.
Q. No doubt what?
A. That in my mind he hadn't been drinking the way he was talking.
Finally, the victim's mother testified:
Q. Okay. Just from your conversation with him, were you able to understand him?

*827 A. Yes, he was real 
Q. Was he stuttering or anything like that?
A. No. No, he was really very  just like I was  he was in the next room. He didn't stutter or slur his words or anything.
After the state rested, the state moved in limine to preclude appellant from introducing his tape-recorded statement to Investigator Vinson and Deputy Ridge. The state argued it was inadmissible hearsay. Appellant argued that he was not seeking to introduce the tape-recording to prove the truth of the statements contained therein, but was offering it to demonstrate to the jury the manner in which he was speaking so that the jurors could determine for themselves whether his slurred speech and incoherence demonstrated intoxication. But even if it was hearsay, appellant argued that the evidence was admissible under the state of mind exception to the hearsay rule. The trial court disagreed, commenting that "the reason that you're trying to introduce the statement that he made to this investigating officer is because you want to prove the truth of the matter that is stated; that is, that what he said was true."
Appellant testified that on the night preceding his wife's shooting, he had several drinks of liquor, champagne, and quite a few beers. He explained that he had taken some Xanax for a headache. The next thing he knew, he was getting into the van and being taken to jail. He couldn't recall talking to his lawyer at the jail or taking the intoxilizer test. He admitted having a problem with alcohol, drinking twelve or more beers daily. At the conclusion of appellant's testimony, defense counsel renewed his request to admit the transcript and tape of appellant's interview with Investigator Vinson, and the request was denied.
Dr. Doheny, a psychiatrist and an expert in forensic psychiatry, opined that appellant suffers from alcohol dependence. Appellant gave a history of experiencing blackouts where he had no memory of events that occurred while he was functioning. Dr. Doheny was asked to give his opinion about appellant's blood alcohol level at the time of the murder. He testified that assuming appellant had a .04 reading at 11:00 A.M. on June 24, and that appellant had consumed roughly the amount of alcohol related by him in his testimony, appellant's level of alcohol at the time of the homicide was .21. He explained that at a level beginning at about .20, persons enter a "stuporous condition" in which they experience a lot of difficulty in assessing their surroundings. Further, he stated, persons may experience blackouts at that level as well. Dr. Doheny explained that a person in a state of alcoholic blackout can perform seemingly normal functions, such as talking on the phone and taking down phone numbers. He explained that the medication Xanax can multiply the effect of alcohol. In his opinion, claimant was intoxicated to a severe impairment level, and at the time of the killing, did not have the faculties to premeditate and form the specific intent to kill his wife.
The state's first rebuttal witness was Deputy Ridge, who transported appellant in his vehicle to the sheriff's office and was present at the custodial interrogation of appellant by Investigator Vinson. He testified:
Q. Did you have an opportunity to observe him  closely observe him?
A. Yes, sir, I did.
Q. Did you see him walk?
A. Yes, sir, I did.
Q. Did he appear to stagger or sway in any way?
A. No, sir.
Q. Did you hear him talk?
A. Yes, sir.
Q. Did he slur or stutter?
A. No, sir.
Q. Did you have any trouble understanding what he said?
A. No, sir, I did not.
Q. Okay. Did you give him directions and tell him to do things?
A. Yes, sir.
Q. Did he have any problem understanding what you told him to do?

*828 A. No, sir.
Q. Did he doze off at any time?
A. No, sir.
Q. Did he appear to blackout or be in a stupor at any time?
A. No, sir.
Q. Now, if the defendant had not been in custody, would you have let him drive his car home that morning?
A. Yes, sir, I would have.
Q. Do you have an opinion as to whether he was intoxicated or even impaired by alcohol or drugs during the time that you observed him?
A. No, sir, he did not appear to be under any influence that I could tell at that time.
The written transcript of the custodial interview of appellant by Investigator Vinson and Deputy Ridge reveals, in pertinent part, the following:
DV: Okay, all I know is we had a shooting. What happened?
WB: I come home. There was somebody in the bedroom and there's nobody in the house `cause Joann's working. Randy's working and I'm the only other one there. And I went in and I told him to hold it. And he screamed and I shot him.
* * * * * *
DV: How much alcohol beverage, uh, how much liquor, beer that you was drinking last night? Any?
WB: Oh, God, yeah.
DV: Or do you think you's still under the influence of that liquor right now?
WB: I think I'm getting a headache.
DV: But you know who we are, you, they, you've got your normal faculties about you? You'd be able to drive a car if you had to, right? If you had your glasses and everything. What I'm getting at, you're not drunk now, is that correct?
WB: No, I don't think I'm du , I'm not that drunk.
DV: Okay, but you know where you are and you're giving us a statement.
WB: I don't know where I am. That's why I'm asking you, where am I?
DV: You're in the Sheriff's Department.
WB: Oh, all right.
* * * * * *
DV: Larry, do you remember calling Pasco county this morning?[*]
WB: Who's (unintelligible)? Who's that?
DV: Don't you have a, a mother in Pasco county? Where's your mother live?
WB: No, I don't have no mother in Pasco county. My mother's dead.
DV: Who lives in Pasco county that you know?
WB: I don't know.
DV: Okay.
AR: Where's Joann's mother live?
WB: Oh, she lives in New York.
AR: New York.
DV: Did you call her?
WB: Oh, yeah.
DV: Last night? This morning, whenever?
WB: I don't know. I called her sometime.
DV: What'd you tell her?
WB: I don't know, I just called her up.
DV: I mean what'd you talk about?
WB: I don't, I don't remember. I just, I think I talked to her. We try to call every two weeks.
* * * * * *
DV: Have you ever had any group therapy? Okay. Was you and Joann having problems? Was ya'll fussing? Were you fighting?
WB: No, we'd been married twenty-six, it would be twenty-seven years in February. Why are you asking about Joann? Joann's working?
DV: No, she's not.
WB: Where is she?
DV: You shot her.
WB: No, I didn't shoot Joann. Don't be stupid. We've been married twenty-six *829 years (unintelligible) shoot Joann for? It'd be twenty-seven years in February.
* * * * * *
DV: You called somebody in Pasco county 
WB: There ain't nobody in Pasco county I know.
DV: You called Joann's mother.
WB: Where's Pasco county, number one?
AR: It's in South Florida.
WB: South Florida.
DV: Now I want you to think about it.
WB: I'm trying right now, South Florida.
DV: No, I want you to think about the shooting.
WB: South Florida ... you got me lost.
* * * * * *
DV: Let me ask you something else. Do you remember the sheriff's department coming there?
WB: No.
DV: After the shooting?
WB: There was no sheriff's department there.
DV: Okay, do you remember Randy coming in?
WB: That's my boy.
DV: I know. Do you remember him coming in?
WB: He come in for a minute and that's all he did.
DV: You didn't put a gun to his head?
WB: No. I don't think so. I might of. I, I don't remember if I did.
DV: You might have shot Joann, too?
WB: No, I didn't shoot Joann. Don't even say that.
DV: Look at me Larry. I'm telling you what's happened tonight or this morning. Joann has been shot.
WB: Is she okay?
DV: No.
WB: What do you mean "no"?
DV: She's dead.
WB: How could she be dead? She's working.
DV: No, she wasn't working. She's at home.
WB: That don't make sense. She works until she gets home.
* * * * * *
DV: I'm just telling you what happened. I don't know why it happened, but I'm telling you what happened and you've got, you've got some lapses of your memory. You need to, you know, let's try and think. You made some phone calls.
WB: I don't remember making any phone calls.
DV: You called her mother.
WB: I could have.
AR: Did you call your brother?
WB: I ain't got no brother.
AR: Do you have a sister?
WB: I ain't got no sister.
AR: Did Joann have a brother or sister?
WB: Joann's got a sister.
AR: Where does she live?
WB: In New York.
AR: Did you talk to her this morning?
WB: I don't, I don't, I don't remember. I know I called ma  uh, I think I called Mom. I, I, well, we try to call every two, about every two weeks we try to call. I think.
* * * * * *
AR: Randy, we made contact with Randy prior to him coming to the house. He hung up on my dispatcher and called you.
WB: No.
AR: Yes, he did.
WB: No, he didn't. Nobody phoned me.
DV: Just listen a minute. Just listen... .
WB: I didn't talk to anybody. I don't think. I might of. I don't think I did.
* * * * * *
DV: Larry, you know what, what is, I don't quite understand, is you, you go home and you hear a noise in the bedroom, you go in there and you fire. You *830 open the door, somebody screams and you shoot. One time, two time 
WB: Scared the shit out of me `cause my wife don't get home `til late.
DV: Excuse me?
WB: I said it scared the shit out of me `cause my wife don't get home `til late.
DV: You go in, you go in and you open the door, somebody screams 
WB: The door's already open.
DV: You walk in, somebody screams 
WB: Right.
DV: You shoot.
AR: Was the light on or off?
WB: Off.
AR: The light was off?
WB: All my lights are off. I don't keep no lights on. Electric bills are too high.
DV: And then after you shoot, after you hear somebody scream, after you shoot, you don't turn on the light to see who it is?
WB: I don't remember shooting him.
DV: You just told me you shot.
WB: I think I shot. I don't remember. I'll be honest with you. I, I, I remember shooting.
DV: Ten minutes ago you told me that you walked in through the door, somebody, you hear somebody scream and you fired.
WB: No, I didn't say that. I said I heard some noise and I walked in the bedroom and then I heard a scream and I shot.
DV: I didn't understand, tell me that again.
WB: I heard some noise.
DV: Okay.
WB: I think. I don't remember.
DV: And you walked in and what?
WB: And they, and they screamed.
DV: And then what happened?
WB: I shot.
DV: After the shot, did you turn on the light to see who it was?
WB: Hell, no. I don't think I did. I might of.
DV: After the shot, did you come back out and sit down and say, well, I'm gonna fix a sandwich or drink a beer?
WB: I don't remember. I forgot all that. I don't really remember.
DV: Okay, this tape is gonna be terminated at this time. The time is 6:57.
When a defendant seeks to introduce his own prior self-serving statement for the truth of the matter stated, it is hearsay and it is not admissible. Ehrhardt, Florida Evidence § 801.3 (2d Ed. 1984); Moore v. State, 530 So.2d 61 (Fla. 1st DCA 1988); Logan v. State, 511 So.2d 442 (Fla. 5th DCA 1987); Fagan v. State, 425 So.2d 214 (Fla. 4th DCA 1983); and Watkins v. State, 342 So.2d 1057 (Fla. 1st DCA), cert. denied, 353 So.2d 680 (Fla. 1977).
However, if an out-of-court statement is offered for a purpose other than proving the truth of its contents, the statement is admissible provided the purpose for which the statement is being offered is a material issue in the case. See Ehrhardt, Florida Evidence, § 801.2 (2d Ed. 1984). See also Baird v. State, 572 So.2d 904 (Fla. 1990 (law enforcement officer's testimony that officer had received information that defendant was a gambler and was operating a major gambling operation was admissible, and not hearsay, if offered for a purpose other than to prove the truth of the matter asserted; and although testimony was erroneously admitted when offered by the state, it properly could have been later admitted when purpose for which statement was offered became a material issue in case).
In this case, there is no evidentiary basis for the trial court's conclusion that the defense proffered the tape to prove the truth of appellant's statements. Appellant argued below and reasserts here that he did not offer the tape recording to prove that he thought his wife was at work, or that he believed that he had shot a robber who had entered the house. Appellant's defense was that, because he was intoxicated, he was incapable of premeditation, and therefore could not be guilty of first degree murder which is a specific intent crime. The theory upon which appellant *831 proffered the tape recording was that the sound of his voice and his manner of speaking was evidence from which a jury could properly infer that he was intoxicated. The probative value of the tape did not lie in the words stated, but in the way they were stated.
It is abundantly clear that appellant's manner of speaking after the shooting was made a material issue in this case by the state. The state repeatedly asked questions of its witnesses regarding the appellant's manner of speech after the shooting and whether his speech was coherent. Moreover, after having successfully obtained exclusion of the tape-recorded interview, the state called on rebuttal Sheriff Deputy Ridge, who was present when the interview was conducted, and elicited from the deputy testimony to the effect that appellant's speech was perfectly understandable after the shooting. As can be seen from the quoted portions of the transcript of appellant's tape-recorded statement, his speech was often unintelligible, at least to the person who transcribed the interview.[1]
Had the tape been presented to the jury, the jury would have been in a position to compare and contrast the sound and speech patterns of appellant's voice on the tape, which was made within minutes of his arrest and during the same time-frame as covered by the state's witnesses, with the sound and speech patterns of his voice during his testimony at trial. Because of the trial court's ruling, the jury was deprived of a means of assessing appellant's defense that he was too intoxicated to formulate the intent required for first degree murder.
Recently, the United States Supreme Court was faced with a related problem in Pennsylvania v. Muniz, ___ U.S. ___, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990). In that case, Muniz had been arrested for drunken driving and taken to the station house where, among other things, he was asked to respond to some questions regarding biographical information and whether he knew the date of his sixth birthday. His responses were videotaped and were given without prior Miranda warnings. The United States Supreme Court ruled that the audio and video portions of Muniz's answers to biographical questions were properly admitted into evidence at his trial and were not rendered inadmissible by the lack of Miranda warnings merely because the slurred nature of his speech was incriminating. Instead, the court found that any slurring of speech revealed by appellant's responses was non-testimonial. 110 S.Ct. at 2644. The court said that: "Requiring a suspect to reveal the physical manner in which he articulates words, like requiring him to reveal the physical properties of the sound produced by his voice, [citation omitted], does not, without more, compel him to provide a `testimonial' response for purposes of the privilege." It would be inconsistent to say that a defendant's slurring of speech is non-testimonial for purposes of Miranda warnings and yet rule that the same slurred speech is testimonial evidence for purposes of the hearsay rule.
Next, appellant complains that the trial court erred in sustaining the state's hearsay objection and precluding defense witness, Dr. Doheny, from relating what appellant told him concerning the amount of liquor appellant had consumed the night before the murder. Dr. Doheny offered this testimony in response to a question asking his expert opinion regarding appellant's blood alcohol level on the night in question. We agree that the trial court erroneously ruled that this testimony was not admissible.
Section 90.704, Florida Statutes (1987) provides that:
[t]he facts or data upon which an expert bases an opinion or inference may be *832 those perceived by, or made known to, him at or before the trial. If the facts or data are of a type reasonably relied upon by experts in the subject to support the opinion expressed, the facts or data need not be admissible in evidence.
Thus, as the Third District Court of Appeal ruled in Bender v. State, 472 So.2d 1370 (Fla. 3d DCA 1985),
[t]he hearsay rule poses no obstacle to expert testimony premised, in part, as here, upon tests, records, data, or opinions of another, where such information is of a type reasonably relied upon by experts in the field... .
[S]ection 90.704 and the modern cases recognize that the traditional constraints of the hearsay rule do not, in many instances, comport with the reality that expert opinions are based on other than first-hand observation, or matters presented in a trial, and that expert testimony based on "presentation of data to the expert outside of court and other than by his own perception," Law Revision Council Note (1976), 6C Fla. Stat. Ann. § 90.704, at 216 (1979), must be permitted. Inclusion of this source is designated:
to broaden the basis of expert opinion beyond that currently allowed and to bring the judicial practice into line with the practice of the experts themselves when not in court. Thus, a physician in his own practice bases his diagnosis on information from numerous sources and of considerable variety, including statements by patients and relatives, reports and opinions of nurses, technicians, and other doctors, hospital records, and X-rays. The reasonableness of experts' reliance on this data may be questioned on cross-examination.
Id. at 1371-2.
Nevertheless, we find that the error which occurred was harmless because despite the ruling, Dr. Doheny was able to relate considerable testimony concerning his understanding of the amount appellant had to drink that night, before the rather belated hearsay objection was made and sustained. Further, other evidence adequately set forth the amount appellant had to drink that night and provided an evidentiary basis for the doctor's opinion.
Appellant's remaining point is affirmed without discussion.
REVERSED and REMANDED for a new trial.
NIMMONS, J., concurs.
ZEHMER, J., concurs and dissents with opinion.
ZEHMER, Judge, (concurring and dissenting).
I fully concur in Judge Smith's excellent opinion reversing and remanding for a new trial based on error in denying appellant's request to admit in evidence the tape recording of his interview with officers. I also agree that it was error to exclude that part of Dr. Doheny's testimony concerning appellant's statements regarding how much alcohol he had been drinking, although I find it unnecessary for the court to decide whether that error was harmless or not in view of the reversal for a new trial on appellant's first point.
I dissent from the affirmance of appellant's remaining point, which is based on the court's overruling appellant's objection to the admission of certain evidence to impeach the credibility of his witness, Randy Barber. First of all, it is not necessary to reach this issue in view of our reversal on the first point, as I do not believe this evidentiary issue is likely to recur on retrial in the manner it came up during the trial we are presently reviewing. If we must reach the issue, however, I agree with appellant that the trial court erred in admitting this evidence. The state failed to establish the essential predicate required by section 90.614, Florida Statutes (1987), by first confronting the witness with the particular statement, and the time, place and person to whom it was made, and evidence of an inconsistent extrinsic statement by the witness is admissible only if it is shown that the witness "denies making or does not distinctly admit" to making the statement. Ehrhardt, Florida Evidence § 614.1 (2d ed. 1984). Admitting a prior inconsistent statement where the witness admits making it is error. Jennings v. State, 512 So.2d 169 (Fla. 1987). Taking this witness's *833 testimony as a whole, this witness essentially admitted making nearly all of the statements concerning fights between appellant and the victim that were attributed to Randy Barber by the state's witnesses. Even assuming this testimony was admissible, appellant was entitled to a cautionary instruction by the court to the jury that the statements were admitted only for purposes of impeachment of this witness and not to prove the truth of the matters stated. I note this because it appears that the state presented impeachment testimony concerning Randy's statements that his mother and appellant had been fighting not just to impeach Randy's credibility, but rather to prove motive and intent through otherwise inadmissible hearsay statements that appellant had been fighting with his wife prior to the incident giving rise to these charges. Moreover, certain testimony by a state's witness that Randy said he had a fight with appellant related to a purely collateral matter as to which Randy's denial on cross-examination was binding. Gelabert v. State, 407 So.2d 1007 (Fla. 5th DCA 1981).
If nothing else, perhaps these comments will alert the attorneys on retrial to certain pitfalls that can be avoided by careful preparation and examination of the witnesses to assure that the testimony is properly admissible.
NOTES
[*] In addition to calling his wife's relatives on the morning of the shooting, appellant also called his stepmother, who lived in Pasco County.
[1] Although our decision is not based solely upon our own assessment of the probative value of the tape recorded statement, we note, after listening to the tape, that appellant's contentions regarding the unusual, and partially unintelligible or incoherent nature of appellant's statements are not without foundation. Obviously, since the appellate court has not had the benefit of hearing appellant's ordinary speech, we have no basis for comparison. We observe, however, that the trial court's ruling excluding the tape was not based upon its lack of materiality or relevancy for the purpose for which it was offered by appellant.