680 So.2d 514 (1996)
Donald F. HOUGHTON, as personal representative of the Estate of James Orville Houghton, and United Services Automobile Association, Appellants/Cross-Appellees,
v.
William E. BOND, Jr., as parent and guardian of William Emile Bond, III, Appellee/Cross-Appellant.
No. 94-1330.
District Court of Appeal of Florida, First District.
April 24, 1996.
*516 Alan R. Horky of Fuller, Johnson & Farrell, P.A., Pensacola, for Appellants/Cross-Appellees.
Robert G. Kerrigan of Kerrigan, Estess, Rankin & McLeod, Pensacola; and Joel S. Perwin of Podhurst, Orseck, Josefsberg, Eaton, Meadow, Olin & Perwin, P.A., Miami, for Appellee/Cross-Appellant.
PER CURIAM.
This cause is before us on appeal and cross appeal from a final judgment entered on an order granting a post-trial motion for directed verdict and setting aside the jury's reduction of damages. We find the point raised on cross appeal to be without merit and affirm as to this issue without further comment. As to the appeal, we reverse and remand with directions to reinstate the jury's verdict and apportionment of damages.
James O. Houghton (hereinafter "Houghton") and William E. Bond, III (hereinafter "Bond") were involved in an automobile accident on the evening of June 16, 1988. Houghton, who was traveling alone, lost his life in the accident. Sixteen-year-old Bond, who was driving the family Chevrolet Blazer with a sixteen-year-old front seat passenger (Lindsay), was not wearing a seat belt and suffered life-threatening injuries. Passenger Lindsay, on the other hand, was wearing a seat belt and, although temporarily dazed at impact, was able to climb out of the Blazer and walk away from the accident with only a superficial injury to his chin and, in his words, a "cracked wrist."
After Bond was extricated from the Blazer, he was taken by ambulance to Baptist Hospital in Pensacola. Upon his arrival at the emergency room, he was comatose and in obvious and acute respiratory distress. During attempts by physicians to treat his breathing difficulty, Bond became combative and a paralyzing drug was administered so that an adequate air passage could be opened. In addition to his breathing problem, Bond suffered massive facial and scalp lacerations, a fractured deformity of his right leg, and internal bleeding resulting from a lacerated liver. Bond's mandible had been pushed up into the base of his skull, fracturing his jaw as well as causing a break in the base of his skull and the release of spinal fluid through his left ear. Other than some reactive brain stem response to stimuli, Bond's brain did not appear to be functioning. Chest x-rays revealed what turned out to be part of a dental plate or bridge lodged in his right lung. Considering the totality of his injuries, Bond's expert medical witness later testified that when he first arrived at the emergency room, Bond was not expected to survive the accident: "When he came in he should have possibly died or have been in a vegetative state."
In time, Bond made a dramatic recovery from his multiple injuries although, at the time of trial, he still suffered from some residual physical and psychological effects related to those injuries.
Bond, through his father, instituted a negligence action against Houghton's estate and *517 Houghton's insurer, United Services Automobile Association (hereinafter "Defendants/Appellants"), for the injuries he received in the accident. Defendants/Appellants answered the allegations of Bond's complaint and asserted as an affirmative defense that his injuries were caused primarily by his failure to wear an available and operational seatbelt.
Among the witnesses called at trial by Plaintiff/Appellee was a mechanical engineer, Bruce Wiggins. Mr. Wiggins was qualified as an expert in accident reconstruction and, after questioning, offered his ultimate opinion that it was likely that Houghton's vehicle was partially in Bond's lane when the collision occurred. Mr. Wiggins was not qualified as an expert on the use of seatbelts and offered no testimony about crash tests or studies relating to the potential consequences involved in the failure of a motor vehicle's occupants to use seatbelts.
Passenger Lindsay testified by deposition on behalf of Plaintiff/Appellee that only moments before impact, it appeared to him that the headlights of Houghton's vehicle were in Bond's lane.
Plaintiff/Appellee's expert medical witness, Dr. E. Fletcher Eyster, a neurological surgeon, testified live to Bond's injuries. He also offered the opinion that these injuries were occasioned when the young man struck the steering wheel of the Blazer upon impact with Houghton's vehicle. This testimony was objected to on the ground that Dr. Eyster was not qualified to express an opinion on the dynamics of body movement within a vehicle involved in a collision. Defendants/Appellants' objection was sustained, and Dr. Eyster was not permitted to express the opinion he offered. During the trial Dr. Eyster was not asked, nor did he express an opinion, on whether medically-based evidence existed which would support a conclusion that, in the collision, Bond struck the steering wheel a glancing blow or whether it could be medically ascertained what Bond struck inside the vehicle that produced his grievous injuries.
For their part, Defendants/Appellants engaged the services of Dr. Charles Benedict and qualified him at trial as an expert in accident reconstruction, occupant kinematics [1] and biomechanics[2] related to an automobile seat belt restraint system in a motor vehicle involved in a crash.
In that portion of his testimony dealing with accident reconstruction, Benedict concluded that the Blazer in which Bond and Lindsay were riding drove off onto the shoulder of the road, and Bond overcorrected and swerved across the center line of the highway into the path of Houghton's vehicle. Further, Benedict used videotaped re-enactments to cast doubt on the accuracy of Bond's accident reconstructionist, Bruce Wiggins, and Lindsay relative to the speeds and position of the automobiles involved at the time of collision.
Because Bond objected to and moved in limine to prevent Dr. Benedict from testifying on occupant kinematics, which Bond's counsel labeled as "pseudo-science, junk science with no scientific reliability whatsoever," a proffer of the witness' testimony was first made. Dr. Benedict expressed the opinion on the closing speed and stopping speed of the vehicles involved in the collision and that Bond's head hit the Blazer's dashboard at 45 mph because he was not buckled in. Benedict also concluded that the impact pressures on Bond were upwards of 100 times greater because he was not belted and that with such a restraint in place, Bond, at most, *518 would have hit the steering wheel a glancing blow on the left side of his head as his body traveled to the right and forward rather than a full frontal blow to the dashboard. The witness also expressed the view that, had Bond been wearing his seatbelt, the forces he experienced and the injuries he sustained would have been less than or, at most, equal to those sustained by Lindsay.[3]
Dr. Benedict also testified regarding a government study (the New Car Assessment Program) produced by the National Highway Traffic Safety Administration which contains crash data on cars (e.g., speeds, amount of crush, accelerations of occupants, femur load, force of the chest against the lap belt) including head injury criteria, which is "the measure of what the accelerations to the brain and head are." He testified that when the criteria for a vehicle occupant exceeds 1000, the "serious injury threshold" is reached and "that means you're beginning to hit something internally to the vehicle and cause impact to the skull." "Anything above that number [serious injury threshold], you're likely to get serious brain injury. Anything below that number, you're going to have not serious brain injury. It doesn't mean you're not going to have injuries. It means that you're not going to have serious enough injury that they consider it a real problem." Benedict explained how he extrapolated from the figures produced in the study to determine the forces acting on the occupants of Bond's vehicle in regard to the collision in this case. His opinion was that had Bond worn a seatbelt, the forces acting on him would not be sufficient for him to sustain a serious head injury.
At the close of the proffered testimony, the trial court ruled that Dr. Benedict could testify as to what seatbelts allow and what they prevent, the forces acting upon Bond during the collision, where he was thrown, and what he hit and how hard. The court also indicated that Benedict would be permitted to compare the forces experienced by the seatbelted passenger, Lindsay, to those experienced by Bond. When Bond objected to Benedict's recitation of figures from the government study, the court ruled that the witness "could give the basis and the data that he used in formulating his opinion." "Of course, an expert can use other data as a basis to formulate their [sic] opinion, but as both sides agreed before he came in here, he can't say, well, witness so-and-so or the trooper agreed that this is the way it happened, and I agree with it too; in other words, you can't bootstrap up your opinion by saying other people agreed with me. And quite candidly, I did not hear that from his testimony. He referred to government studies and dummy crash tests and all that, which is what people do. I mean, that's the things that they study to arrive at opinions. I've got no problem with him testifying to that."
Before the jury, Dr. Benedict testified consistently with the proffer of his testimony. During cross-examination by Bond's counsel, the following exchange occurred:
Q. What portion of this young man's brain injury that you have called severe would you say was attributed to the seat belt problem? I mean, are you going to give us a medical opinion about 30% or 40 or 50? What are you going to tell us about that?
A. I can't answer that question, sir, because I don't know exactly what his residual brain injuries are at this point, and exactly what part of the brain they are, I'm talking about exactness, talking about what section of the brain. What I can say, and I have said, is that based on the NCAP test data, he would not have received a high enough head impact criteria number, an acceleration of the brain and the skull, to reach the serious injury threshold. And it's clear, at least to me in my opinion, that he well exceeded the serious injury threshold when he smashed his face into that dashboard going 45 mph head first.
Notwithstanding Dr. Benedict's admitted lack of expertise to offer a "medical opinion" ascribing a percentage figure in apportioning young Bond's head injuries to his failure to wear a seatbelt, Bond's counsel persisted in this line of questioning:

*519 Q. Your testimony is that you have no idea what portion of the brain injury that he has today, what portion of that, is attributed to this seat belt business that you testified to; you're not able to give us a percentage of this injury that you would attribute to this seat belt; is that correct?
A. Well, I would attribute 90% or more of his injury to the impact with the dashboard, very strongly based on what his
Q. (Interposing) His brain injury?
A. Yes, sir, because he's going to have forces on his brain that are a 100 times greater than if he hits the steering wheel.
Bond's counsel neither made a timely objection to this testimony, nor moved to strike it, nor requested a curative instruction.
At the close of all the evidence in the case, Bond moved, as follows: "one, to strike the seat belt defense, two, a directed verdict on the issue of comparative negligence on the seat belt issue, three, strike the testimony of Dr. Benedict with a curative instruction to the jury." These motions were denied. During the jury instruction charge conference, Bond requested that the court not send the seatbelt issue to the jury because the jury would have no basis to apportion damages except the apportionment made by Dr. Benedict which, Bond argued, amounted to medical causation testimony that Benedict was unqualified to give. The trial court indicated that the seatbelt issue would go to the jury, after which Bond's counsel renewed the motions previously made, which were again denied.
By verdict returned on November 2, 1993, the jury found that Bond had sustained damages of $3,000,000, but that he was 80% responsible for the collision. The jury further found that 90% of Bond's injuries resulted from his failure to wear a seatbelt. Bond's damage award was thus reduced by 80% to $600,000 and then by 90% to $60,000. Houghton sustained damages of $472,000, which was reduced by 20% to $377,600.
On November 12, 1993, ten days post-trial, Bond filed a motion for judgment in accordance with his previously made motion for directed verdict, and a motion for new trial or, in the alternative, a motion to reallocate fault notwithstanding the jury verdict. In support of these motions, Bond's counsel solicited and submitted three affidavits: one from Bruce Wiggins, Bond's accident reconstruction expert; one from Dr. Eyster, Bond's medical expert; and one from a Joseph McClain, a mechanic in the Pensacola area who did not testify at trial. The sole and obvious purpose of these affidavits was to contradict and discredit portions of Dr. Benedict's trial testimony. After a hearing on Bond's post-trial motions, the court apparently invited counsel to submit, by letter, the case authority upon which each relied.[4]
On January 27, 1994, Mr. Kerrigan, representing Bond, responded in a letter to the court which reargued Bond's position regarding Benedict's seatbelt testimony and to which copies of several cases and the Eyster affidavit were appended.
On February 10, 1994, Mr. Pitts, representing Defendants/Appellants, responded to Mr. Kerrigan's earlier letter. He outlined Defendant/Appellants' position and, inter alia, requested the court to take no notice of the affidavits acquired and submitted post-trial. On February 17, Mr. Kerrigan responded by letter to Mr. Pitts' letter of February 10. In addition to rearguing Bond's position, this letter made the following request:
The motion for directed verdict should be granted, and we respectfully request that if the court agrees with our position, that we be allowed to draft a detailed order that makes specific reference in the record to the testimony necessary to support the court's order on appeal.
Predictably, this letter evoked the following response from Mr. Pitts:
I recently returned from being out-of-town and received Mr. Kerrigan's letter of February 17, 1994. The letter is quite lengthy and addresses additional points.
In my opinion this letter is totally improper. It was my understanding at the hearing that Mr. Kerrigan would write a letter and that I would then respond. I *520 was unaware of any provision for yet a further response by Mr. Kerrigan in which he makes assertions that I have agreed to things to which I had not agreed. I would ask the court to either strike and not consider Mr. Kerrigan's letter or any of the cases he cites or to give me until March 11, 1994 to respond to the issues raised.
Thereafter, there is nothing in the record to indicate whether or in what manner the court responded to Mr. Kerrigan's request to prepare the order now on appeal, or to Mr. Pitts' request to respond to Mr. Kerrigan's letter of February 17. However, in their brief and at oral argument, Defendants/Appellants asserted that the order on appeal was prepared by Bond's attorney, which representation does not appear to be in dispute. The record is silent as to whether Houghton's counsel was furnished with a copy of the proposed order either prior to or at the time of its submission to the court. In any event, the next entry in the record is an order granting Bond's post-trial motion for directed verdict and striking Houghton's seatbelt defense in its entirety.
The substance of this order is contained in six paragraphs and provides as follows:
1. There is no plausible basis for the jury finding that 90% of plaintiff Bond's injuries were caused by his failure to wear an available seat belt other than the testimony of Dr. Charles Benedict, an engineer hired by defendant, Houghton.
2. It is undisputed that the forces involved in the collision were sufficient to cause injury to a belted occupant of the Bond vehicle, in fact the belted passenger of the Bond vehicle was injured by striking the dashboard. Dr. Benedict admitted that, given the stretch of the seat belt and the deformation of the vehicle, Mr. Bond would have struck the steering wheel with his head even if belted.
3. Dr. Benedict's endeavor to discriminate between the blow Mr. Bond received and the blow he would have received is based upon Dr. Benedict's analysis of brain anatomy and function. Dr. Benedict demonstrated a lack of expert qualification in this area as well as a lack of factual basis for such testimony.
4. Much of Dr. Benedict's testimony was heard by the jury only because he repeatedly volunteered information unresponsive to any question in a fashion that made timely objection difficult. The court notes that this is apparently Dr. Benedict's custom. Referring to an intentional violation of a motion in limine order by Dr. Benedict, the First District observed:
We specifically note that this statement of the witness was not called for by the question asked and was clearly volunteered by the witness. See Ratley v. Bachelor [Batchelor], 599 So.2d 1298 (Fla. 1st DCA 1991).
5. Dr. Benedict's demeanor on the witness stand reinforces the court's finding that his performance on the stand was more a debate with counsel than a proper attempt to answer the questions posed.
6. Dr. Benedict's habit of volunteering authoritative sources to support his opinions in direct examination, as well as his repeated unresponsive answers given throughout this examination, culminated in Dr. Benedict's freely expressing opinions in areas for which he had no training and no expertise.
Notwithstanding Bond's counsel's commitment to the trial court to make "specific reference in the order to the testimony necessary to support the court's order" if permitted to draft a "detailed order," the order entered contains no such references. Indeed, the order primarily reflects counsel's rather generalized disdain for both Dr. Benedict and his testimony, which was underscored at one point during the proceedings below when counsel advised the court that "Benedict is the source of my irritation" and referred to him later as the actor/witness Benedict.
The subject order finds that, other than the testimony of Dr. Benedict, there is "no plausible basis for the jury finding that 90% of plaintiff Bond's injuries were caused *521 by his failure to wear an available seatbelt." We disagree. The record contains more than ample evidence to support this finding quite apart from Benedict's apportionment testimony. Bond's own expert medical witness, Dr. Eyster, testified in graphic detail as to Bond's grievous, life-threatening head injuries. In so doing, he attributed these injuries to Bond's hitting "something" in the Blazer during the collision. Although Dr. Eyster was not permitted to express an opinion as to the "something" Bond hit, Dr. Benedict's non-apportionment testimony, which the court expressly found him qualified to give, established that the "something" was the Blazer dashboard and that Bond's head injuries, whatever they were, were suffered when his head and face hit the dashboard while traveling at 45 miles per hour. When comparing the seriousness of the injuries suffered by Bond and his passenger, Lindsay, the jury could well have concluded that 90%, or more, for that matter, of Bond's head injuries resulted from his failure to wear his seatbelt.
The appealed order also concludes, in part, that Benedict's testimony is based upon the witness' analysis of brain anatomy and function. Again, we disagree. Although not competent to express a "medical opinion," Dr. Benedict's apportionment testimony dealt with the area of occupant kinematics and was not based on brain anatomy and function. Moreover, it was elicited by Bond's counsel and provided the foundation to support Bond's at-trial and post-trial motion for directed verdict. Had Bond's counsel objected to such testimony on the ground that it invaded the fact-finding function of the jury, the objection may have been well taken. Benedict's testimony, however, did not amount to medical causation evidence, as Bond now asserts.
Given the appealed order's reliance on Bond's counsel's personal opinions regarding Dr. Benedict's "demeanor", "custom" and "habit" to support striking the seatbelt defense, we have carefully plumbed the record to find support for what have become findings by a stroke of the judicial pen. Our independent research has failed to turn up the "testimony necessary to support the court's order" as promised by Bond's counsel, which seems to us a reasonably predictable result when counsel for one of the parties to a hotly contested lawsuit requests and is permitted to prepare a dispositive order in that litigation without judicial guidance of record and counsel's work product is uncritically accepted and entered as submitted. If, for example, as the order finds, Dr. Benedict's "performance on the stand" was more a debate with counsel than a proper attempt to answer the questions posed by Bond's counsel, such was due in no small measure to the tenor of counsel's often argumentative and sarcastic questioning of the witness. In making this observation, we imply no particular criticism of the trial court judge, who was charged with ensuring that this matter did not become a trial by personality. He was presented with surprisingly few objections from the parties to either questions or answers. At no time did Bond's counsel complain to the trial court about Dr. Benedict's responses to his questions except for an instance when Dr. Benedict used the word "we" in expressing his own opinion, and at another time when Dr. Benedict requested that counsel read from the report he (Dr. Benedict) had furnished counsel. We note also that during Benedict's entire testimony as to the seatbelt defense, Bond's counsel raised only a single objection, which was that Dr. Benedict's testimony as to his qualifications was self-serving.
We turn next to Bond's contention made in his brief and at oral argument that Dr. Benedict's use of government-conducted crash tests in arriving at the opinions he expressed regarding such data rendered him but a conduit for inadmissible hearsay evidence. We believe, for several reasons, that such an argument is unavailing. First, no objection was made to Dr. Benedict's use of the governmental data during the proffer of his testimony, and the court expressly stated that such government studies and tests were the types of documents upon which field experts rely in formulating opinions. During his testimony before the jury, Dr. Benedict was explaining how he determined the speed of the vehicles involved in this tragic occurrence based upon information contained in *522 government crash-test data. At this point, Bond's counsel interposed, stating
[T]he witness may express an opinion based in part on matters that are outside the evidence in the case but he cannot recite that as substantive evidence in the case....
Counsel clearly did not object to opinions expressed in reliance on government test data. The trial court overruled the objection and stated that an expert is permitted to give the basis and data he used in formulating his opinion. In the case at hand, the government study which provided the basis of the witness' opinion did not itself have to be admissible for the expert's opinion to be admissible. Here, the trial court correctly allowed Dr. Benedict to explain the basis for his opinion. Barber v. State, 576 So.2d 825 (Fla. 1st DCA 1991). This testimony was clearly intended to aid the jury in understanding the opinion Dr. Benedict was expressing, and he was not a conduit for inadmissible hearsay, as is now contended by Bond. See Sikes v. Seaboard Coast Line R.R., 429 So.2d 1216, 1222-23 (Fla. 1st DCA), review denied, 440 So.2d 353 (Fla.1983).
We now address the issue of the propriety of Bond's soliciting and submitting post-trial affidavits intended to discredit Dr. Benedict's seatbelt testimony at trial and the trial court's consideration of such affidavits in granting a post-trial motion for directed verdict in accordance with such a motion made at trial. We know of none, nor have we been directed to any authority of any kind in the law of this or any other state, that sanctions what was done below.
In this state it is well settled that under Florida Rule of Civil Procedure 1.480, a party is permitted to challenge the legal sufficiency of the evidence before the case is submitted to the jury. However, a party cannot seek judgment in accordance with a previously-made motion for directed verdict unless that party has actually asserted the grounds raised in the motion for directed verdict made at the conclusion of the evidence in the case. Allstate Ins. Co. v. Gonzalez, 619 So.2d 318 (Fla. 3d DCA 1993).
We can find no authority for the proposition that a party is permitted to seek a directed verdict after trial on the ground that the non-moving party's expert, previously determined to be competent, is "wrong" or "incorrect" because other experts, when shown or told of his trial testimony, disagreed with it. In the instant case, the after-acquired affidavits offering evidence not brought before the court or jury during trial cannot support the appealed order. Their submission constituted an abuse of the procedure authorized by Florida Rule of Civil Procedure 1.480, and their consideration by the trial court in determining to strike Dr. Benedict's seatbelt testimony constituted reversible error.
With respect to the granting of a motion for directed verdict, such a motion should be considered by a trial court with extreme caution, because the granting thereof amounts to a holding that the non-moving party's case is devoid of probative evidence. Perry v. Red Wing Shoe Co., 597 So.2d 821 (Fla. 3d DCA 1992). A motion for directed verdict should not be granted unless the trial court, after viewing the evidence in the light most favorable to the non-moving party, determines that no reasonable jury could render a verdict for the non-moving party. Great S. Peterbilt, Inc. v. Geiger, 616 So.2d 1127 (Fla. 1st DCA 1993); Miller v. City of Jacksonville, 603 So.2d 1310 (Fla. 1st DCA 1992). When considering a motion for directed verdict, the court must assume that the non-moving party's evidence, and all reasonable inferences therefrom, are true. Cowen v. Thornton, 621 So.2d 684 (Fla. 2d DCA 1993), review denied, 634 So.2d 629 (Fla.1994). All inferences of fact must be construed strictly in favor of the non-movant. Regency Lake Apts. Assocs., Ltd. v. French, 590 So.2d 970 (Fla. 1st DCA 1991).
In reviewing the propriety of a directed verdict, an appellate court must weigh all the facts and inferences to be drawn therefrom in the light most favorable to the party against whom the judgment has been granted, and the directed verdict can be upheld only if there is no evidence or reasonable inference which would support a jury verdict in the appellant's favor. Kowkabany *523 v. Home Depot, Inc., 606 So.2d 716 (Fla. 1st DCA 1992); Jones v. Heil Co., 566 So.2d 565 (Fla. 1st DCA 1990).
In the case at bar, the trial court entered a directed verdict not only as to the jury's apportionment of 90% of Bond's injuries to his failure to wear his seatbelt, but as to the entire seatbelt defense. Thus, for this court to sustain the trial court's ruling, we must find not only that no lawful view of the evidence would support the jury's 90% apportionment, but also that no lawful view of the evidence would support any apportionment of Bond's injuries to his failure to wear a seatbelt. In other words, this court would have to be of a view that in the absence of a medical opinion apportioning a specific percentage of Bond's damages to his failure to wear a seatbelt, evidence relative to his seatbelt defense would, as a matter of law, be insufficient to reach the jury. We decline to so hold.
Whether a defendant is obliged at all to present expert testimony in support of a seatbelt defense appears to depend upon the nature of the plaintiff's injuries. From what we can glean from the reported cases, the rule appears to be that in certain cases, such as those involving non-impact sprain/strain or orthopedic injuries (e.g., a herniated disc), the party offering a seatbelt defense is required to present expert testimony because the precise cause of the plaintiff's injury (i.e., whether the injury would have occurred had the plaintiff worn his seatbelt) is not within the province of the jury. In State Farm Mut. Automobile Ins. Co. v. Smith, 565 So.2d 751 (Fla. 5th DCA) cause dismissed, 570 So.2d 1306 (Fla.1990), the court affirmed the decision of the lower court to exclude all evidence and argument concerning the seatbelt defense in a case in which the plaintiff was seeking recovery for a herniated disc only, and in which no expert testimony relative to the seatbelt defense was presented. In so holding, however, the court in Smith acknowledged that in certain cases, a defendant will not need an expert to sustain his burden of proving a causal relationship between the injuries sustained and the plaintiff's failure to use a seatbelt. The court in Smith gave, as an example of such a case, a case in which the plaintiff sustained injury by being ejected from a motor vehicle following an accident. It reasoned that whether the plaintiff's injuries in such case resulted from the failure to wear his seatbelt would be within the province of the jury. In Burns v. Smith, 476 So.2d 278 (Fla. 2d DCA 1985), the plaintiff sustained, as in the case at hand, an impact-related injury. The jury apportioned 75% of the plaintiff's injuries to his failure to wear a seatbelt. The Second District specifically rejected the plaintiff's contention that in the absence of expert testimony relative to the seatbelt defense, there was no evidence of the causal relationship between his failure to wear a seatbelt and his injuries. The effect of the plaintiff's failure to wear his seatbelt was held to be a jury matter.
It appears that in applying the holdings of Smith and Burns to this case, Houghton was not obligated to present any expert testimony as to the effect of Bond's failure to wear his seatbelt. All Houghton was required to do was present competent evidence that Bond was not wearing his seatbelt and competent evidence that his injuries resulted from impact within the interior of the vehicle. The effect of Bond's failure to wear his seatbelt in this case was for the jury to decide. The uncontroverted lay and medical evidence below established (1) that Bond's vehicle had an available and operational seatbelt; (2) that Bond was not wearing his seatbelt at the time of the accident; (3) that Lindsay, the front-seat passenger in Bond's vehicle, was wearing his seatbelt at the time of the accident; and (4) while Lindsay suffered only superficial injuries, Bond sustained life-threatening injuries. As previously stated, we find the record in this case to be replete with evidence from which a jury could have concluded that 90% of Bond's injuries were a result of his failure to wear a seatbelt. Moreover, even if Houghton was obliged to present expert testimony, Dr. Benedict's opinions within the field of occupant kinematics (excluding his apportionment testimony), coupled with the aforementioned lay and medical evidence, constituted a more than adequate evidentiary basis for the jury to make an apportionment under the seatbelt defense. Our research reveals that no Florida *524 appellate court has gone so far as to require a medical opinion expressly apportioning a certain percentage of a plaintiff's damages to the failure to wear a seatbelt. We decline to accept Bond's invitation to do so in this case.
In conclusion, assuming that Dr. Benedict's apportionment testimony was inadmissible, its admission may be grounds for objection, a motion to strike, a curative instruction and/or a mistrial, if requested. Such admission, however, does not entitle a party who has failed to request such a remedy to a directed verdict. Accordingly, the order on appeal and the judgment based upon that order is reversed, and this cause is remanded to the trial court with instructions to reinstate the jury's verdict and apportionment of damages. The trial court's ruling on the issue cross appealed is affirmed.
Affirmed in part, reversed in part and remanded with instructions.
ERVIN and MINER, JJ., concur.
BENTON, J., concurs in result only.
NOTES
[1] As described by Dr. Benedict, "Kinematics is the study of the geometry of a system; that is, if you have a linkage system, where it links and the system moves from one place to the other, how you can calculate or determine where they're going. For instance, the human body is a series of linkages that move around and they're controlled by muscles or what have you. So, kinematics is really the study of geometry and the path of where things have to go given their restraints."
[2] Dr. Benedict defined biomechanics as the study of what happens to the body when the body strikes certain parts of the vehicle or the interior parts of the vehicle. "In other words, it's the study of injury mechanism as it relates to the path that the occupant follows within and without the vehicle and the forces that act on the body at different locations and what injuries would you expect to see, what injuries you would not expect to see and how do you mitigate or reduce those injuries in the field of restraint systems."
[3] No testimony regarding seatbelt usage other than that offered by Dr. Benedict was introduced at trial nor was Benedict deposed pre-trial regarding his seatbelt testimony.
[4] A transcript of this hearing is not included in the record on appeal.